UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

WOODHOLLOW LOFT, INC.,            )
                                  )
        Appellant/Defendant,      )
                                  )
    v.                            )     CIVIL NO.  2:10cv83
                                  )
SISTERS OF ST. FRANCIS HEALTH     )
SERVICES, INC. d/b/a ST. MARGARET )
MERCY HEALTHCARE CENTERS,         )
                                  )
        Appellee/Plaintiff.       )

OPINION AND ORDER

This matter is before the court on an appeal from the Bankruptcy Court for the Northern

District of Indiana, Hammond Division.  Appellant Woodhollow Loft, Inc., ("Woodhollow"),

filed its opening brief on March 9, 2010.  The Appellee/Cross Appellant, Sisters of St. Francis

Health Services, Inc. d/b/a St. Margaret Mercy Healthcare Centers ("SSFHS"), filed its response

on March 22, 2010, to which Woodhollow replied on April 6, 2010.  SSFHS filed a reply to the

cross-appeal on April 19, 2010.

For the following reasons, the decision of the Bankruptcy Court will be affirmed.

Discussion

The sole issue on direct appeal is whether the Bankruptcy Court, the Honorable J. Philip

Klingeberger presiding, erred in determining that Woodhollow has no right or privilege to the

continued use of Indiana Type 210-1 Retailer Alcoholic Beverage Permit No. RR45-16715.

The sole issue in the cross-appeal is whether the Bankruptcy Court erred in determining

that SSFHS' proof of claim against Woodhollow was untimely and therefore not allowable for

consideration by the Bankruptcy Court.

At all times relevant to this action, Woodhollow was an Indiana corporation that has maintained an office in Munster, Indiana and operated a restaurant and bar in Schererville, Indiana at all times relevant hereto. Woodhollow is the debtor in the underlying Chapter 11 proceeding.

SSFHS is an Indiana not-for-profit corporation that has operated healthcare-related facilities at various locations in north and central Indiana, including Omni-41 in Schererville, Indiana at all times relevant hereto.

St. Margaret Mercy Healthcare Centers ("SMMHC") is an Indiana not-for-profit corporation and wholly-owned subsidiary of SSFHS.

Woodhollow now appeals the Bankruptcy Court's November 16, 2009 judgment order and memorandum decision in which it determined that the appellant did not have a right or privilege to the continued use of Indiana Type 210-1 Retailer Alcoholic Beverage Permit No, RR45-16715 (the "Permit") and was therefore required to transfer the Permit to SSFHS' designee.[1]

The Bankruptcy Court Clerk entered judgment on November 16, 2009 as required by Fed.R.Bankr.P. 9021(a) and 9022. Woodhollow filed a timely Notice of Appeal on November 25, 2009 pursuant to Fed.R.Bankr.P. 8001 and 8002.

The Bankruptcy Court maintained jurisdiction as to the adversary proceeding pursuant to 28 U.S.C. §1334(b), 28 U.S.C.§157(a), and N.D.Ind.L.R. 200.1(a). The adversary proceeding was a "core" proceeding under 28 U.S.C. §157(b)(2)(A) and (C). The adversary proceeding was

---

[1] On December 4, 2009, SSFHS initiated a cross-appeal of the bankruptcy court's November 16, 2009 determination that it has no allowable claim against Woodhollow in case number 07-20206.

submitted to the Bankruptcy Court for disposition on a stipulated record.

The district court has appellate jurisdiction over the subject judgment. <u>Matter of Andy Frain Services, Inc.</u>, 798 F.2d 1113, 1124 (7th Cir. 1986); 28 U.S.C. §158(a); N.D.Ind.L.R. 200.1(d).

The Bankruptcy Court's findings of fact are reviewed for clear error and all legal determinations are reviewed de novo. <u>Monarch Air Serv., Inc. v. Solow</u>, 383 F.3d 663, 666 (7th Cir. 2004). "When both the relevant law and the specified facts are clear, and the job of the bankruptcy court was to apply the law to the facts of the case, we reverse that court's conclusion only if clearly erroneous." <u>In re Rovell</u>, 194 F.3d 867 (7th Cir. 1999); <u>Cook v. City of Chicago</u>, 192 F.3d 693, 696 (7th Cir. 1999). If the record supports more than one permissible conclusion, the factfinder's selection therefrom cannot serve as a basis for clear error. <u>EEOC v. Sears, Roebuck & Co.</u>, 839 F.2d 392, 399 (7th Cir. 1988). However, a deferential standard does not allow the appellate court to ignore errors that it is duty bound to reverse. <u>Cook</u>, 192 F.3d at 697. Reasonable doubt should be resolved in favor of the factfinder. <u>Id</u>.

The parties have agreed to the statement of the case, as follows. SMMHC, now a wholly-owned subsidiary of SSFHS, purchased the facility located at 221 South Route 41 in Schererville ("Omni-41") in January 1998. [See, R.ExA, R.ExD, R.ExE.][2]  The asset purchase agreement ("Asset Purchase") included certain assets of Et Al, Inc., the owner and operator of the Time-Out

---

[2]  References to docket entries from the underlying Chapter 11 bankruptcy action are cited as BD__; references to items docketed in the subject adversary proceeding are cited as AD__. Exhibits included in the stipulated record are cited as R.Ex__. Entries made by the district court on appeal are cited as DD__.

Sports Bar, a bar and restaurant located within Omni-41.[3]  At the time of the purchase, Et Al

owned Indiana Type 210-1 Retailer Alcoholic Beverage Permit No. RR45-16715 ("Permit")

issued by the Indiana Alcoholic Beverage Commission ("Commission").[4]  The Permit was

excluded from the Asset Purchase and remained the property of Et Al.[5]

In conjunction with the Asset Purchase, SMMHC entered into a Consulting and Non-

Competition Agreement (the "Consulting Agreement") with Joseph Pellar and Et Al.[6]  The

Consulting Agreement had a three-year term which began on January 1, 1998.[7]  Under that

agreement, Time-Out would continue to operate with the assistance of Pellar and Et Al. During

that time, Et Al was to maintain the Permit for use at Time-Out. SMMHC issued an one-time

payment of $10,000 to Et Al  for its efforts under the Consulting Agreement.[8]  SMMHC never

purchased the Permit from Pellar or Et Al.[9]

In April 1999, SMMHC entered into an agreement with The Sunshine Boys, Inc.

("TSB") to lease the premises formerly occupied by Time-Out for a period of five years.

("Lease").[10]  The original shareholders of TSB were Thomas Fife, Jeff Heuertz and Robert

---

[3]  R.ExA, R.ExD, R.ExE, R.ExH.

[4]  R.ExA, R.ExB.

[5]  R.ExA, R.ExB.

[6]  R.ExA, R.ExB.

[7]  R.ExA, R.ExB.

[8]  R.ExA, R.ExB.

[9]  R.ExA, R.ExB.

[10] R.ExA, R.ExB.

Stiglich.[11]

Et Al subsequently transferred the Permit to Woodhollow, which was formed by Fife, Heuertz and Stiglich, on August 30, 1999. The transfer was made without condition, reservation or right of reversion.[12] The Permit was transferred at the request of SMMHC.[13] SMMHC never demanded the return of the Permit from Et Al or Pellar and could not do so as the records maintained by the Commission show that neither SMMHC nor SSFHS have been holders of the Permit or within its chain of title.[14] Neither Pellar nor Et Al received any consideration from SMMHC or Woodhollow for the transfer of the Permit.[15] Woodhollow never issued any consideration to SMMHC to facilitate its receipt of the Permit.[16]

Armed with the Permit, Woodhollow continually operated a bar and restaurant within the leased premises from October 1999 through July 2007 when it agreed to vacate the premises. During that period, SMMHC and SSFHS never sought to make Woodhollow a party to the Lease.[17] In fact, SSFHS denied Woodhollow's request to assume the Lease. As a result, Woodhollow was a tenant at sufferance during the term of its occupancy.[18]

---

[11] R.ExH.

[12] R.ExB, R.ExH.

[13] R.ExA, R.ExD, R.ExE, R.ExH.

[14] R.ExF, R.ExH.

[15] R.ExA, R.ExF, R.ExH.

[16] R.ExF.

[17] R.ExH.

[18] R.ExF, R.ExH.

SMMHC initiated an action against Woodhollow in the Lake Superior Court under cause number 45D05-0108-CP-384 seeking ejectment and prejudgment possession of the leasehold. On August 27, 2001, the state court entered an Agreed Order Regarding Prejudgment Possession ("Agreed Order") which required TSB and Woodhollow to make certain fixed rent payments while the action remained before the court. Woodhollow made all payments required under the Agreed Order.[19]

Woodhollow filed its Chapter 11 Voluntary Petition on February 2, 2007.[20] Counsel for SSFHS entered their appearance on February 27, 2007.[21] On March 21, 2007, SSFHS filed its Motion for Relief from Stay and Abandonment of Real Property.[22] Woodhollow filed its response to the SSFHS motion on April 17, 2007.[23] Woodhollow then filed its Motion to Assume Lease or Executory Contract Re: Application for Order Granting Authorization to Assume Month to Month Tenancy on June 2, 2007. SSFHS filed its response to Woodhollow's motion on June 22, 2007.[24] Woodhollow filed its reply on June 26.[25] The hearing on the parties' respective motions was held on June 27, 2007. The parties agreed that Woodhollow would vacate the premises by July 31, 2007. The Court issued its order memorializing the outcome of

---

[19] R.ExM.

[20] BD1.

[21] BD23.

[22] BD31.

[23] BD 40.

[24] BD58.

[25] BD59.

the hearing on July 17, 2007.[26]  Woodhollow subsequently vacated the premises in accordance with the July 17th order.

SSFHS initiated adversary proceeding 07-02123 on December 4, 2007 seeking declaratory judgment as to the ownership of the Permit.[27]  Through its verified complaint, SSFHS seeks recovery on the basis of: (1) breach of the Agreed Order, (2) bailment and (3) unjust enrichment.

On December 21, 2007, Woodhollow sought the Court's permission to transfer the Permit and enter into a lease at a new location.[28] SSFHS filed its objection to Woodhollow's request on January 10, 2008.[29] The Court entered an order on January 31, 2008 granting Woodhollow's motion to transfer the Permit and enter into a new lease agreement.[30]

SSFHS filed its claim 5-1 in the Chapter 11 proceeding on January 10, 2008. SSFHS alleged that the minimum value of its claim was $790,560.55 ($303,716.00 in pre-petition rent, $178,901.00 in interest and attorney's fees of $292,950.55). The claim was based on the provisions of the Lease and Ind.Code §32-31-1-17. On April 23, 2008, Woodhollow filed an objection to SSFHS' claim (#5-1) and sought the consolidation of the contested claim with adversary proceeding 07-02123.[31]  A response to the Debtor's objection was filed on June 23,

---

[26]  BD66.

[27]  BD78/AD1.

[28]  BD90.

[29]  BD93.

[30]  BD103/106.

[31]  BD139-140.

2008.[32]  The Court granted the motion to consolidate that same day.

This matter was initially set for a three-day bench trial commencing April 7, 2009. The parties appeared at a final pre-trial conference on March 18, 2009. At that time, the Court was advised that the entire matter would be submitted for determination on a stipulated record.[33]

The parties jointly filed their Statement of Undisputed Material Facts in Support of Determination on Stipulated Record, Designation of Evidence in Support of Determination on Stipulated Record, Designation of Docket Entries in Support of Determination on Stipulated Record and their respective briefs on May 8, 2009. Each party filed a response brief on June 8, 2009.[34]

On November 16, 2009, the Bankruptcy Court issued its memorandum of decision and judgment order. The Court determined that Woodhollow no longer had any right or privilege to continue to use the Permit. Woodhollow was ordered to transfer the Permit to SSFHS' designee. The court also determined that SSFHS had no allowable claim against Woodhollow in case number 07-202006.[35]

Woodhollow filed its Notice of Appeal on November 25, 2009.[36]  The Appellant's Designation and Statement of Issues on Appeal was filed on December 7, 2009.[37]

---

[32]  AD22.

[33]  AD44.

[34]  AD 48-51, 55 and 58.

[35]  AD59-60.

[36]  AD63.

[37]  AD65.

SSFHS filed its Notice of Cross-Appeal on December 4, 2009 as to the court's determination of the consolidated contested matter.[38]

The Bankruptcy Court issued notice of the appellate record transmittal on February 17, 2010. [39]  On February 18, 2010, the appeal and cross-appeal were docketed by the district court under case number 2:10-cv-00083-WCL. The court also acknowledged its receipt of the appellate record.[40] On March 2, 2010, the district court issued notice that it received the stipulated record exhibit binder from the Bankruptcy Court.[41]

Pursuant to Fed.R.Bankr.P. 8010(a)(2), SSFHS agrees with and adopts Woodhollow's Statement of Facts, which are as follows.  SSFHS is an Indiana corporation with its principal office located in Mishawaka, Indiana. SMMHC is presently an operating division of SSFHS. Prior to its merger into SSFHS, effective January 31, 2002, SMMHC was a wholly-owned subsidiary of SSFHS.[42]  SSFHS is the successor in interest to SMMHC.

SMMHC entered into an Asset Purchase Agreement with Sports Unlimited Limited Partnership d/b/a Omni-41 Sports and Fitness Centre, Blade 'N Skate, LLC, Et Al, Inc. d/b/a Time-Out Sports Bar, Joseph J. Pellar, Richard J. Pellar and Russell W. Pellar on or about January 2, 1998.[43]  Et Al, Inc. operated Time-Out ("Time Out") which was located within the

---

[38]  AD64.

[39]  AD67.

[40]  DD1-2.

[41]  DD3.

[42]  R.Ex H, Verified Complaint for Declaratory Judgment to Determine the Ownership of Alcoholic Beverage Permit ("Verified Complaint"), ¶ 5.

[43]  R.Ex A, pg. 17 and Ex. 1 thereto; R.Ex B, pgs. 18-23.

facility located at 221 South Route 41, Schererville, IN, ("Omni-41").[44]  Between 1997 and

August 30, 1999, Et Al, Inc. held an Indiana Type 210-1 Retailer Alcoholic Beverage Permit No.

RR45-16715 ("Permit") which it used in connection with Time Out.[45]  Joseph J. Pellar was

president of Et Al, Inc. and is now deceased.[46]

Pursuant to the Asset Purchase Agreement, the Permit and Et Al's liquor inventory

were excluded from the terms of the sale. The Agreement provides, in part:

> Notwithstanding Section 1.2, the term Assets does not include the following
> assets of Seller ("Excluded Assets"):
>
> Alcoholic Beverage Permit/Inventory. Any and all permits or licenses
> related to the purchase, sale or distribution of alcoholic beverages held by
> Time-Out [Et Al., Inc.] and all alcoholic beverage inventory of Time-Out [Et
> Al., Inc.].

[R.Ex A, pg. 17, Ex. 1 thereto, pgs. 4-5; R.Ex B, pgs. 18-23.]

SMMHC and SSFHS made a policy decision that direct ownership or possession of

the Permit was contrary to their mission as health care providers affiliated with the Roman

Catholic Church.[47]  SMMHC never intended to own or possess the Permit directly.[48]

In conjunction with the Asset Purchase Agreement, Joseph Pellar and Et Al entered into

a Consulting and Non-Competition Agreement with SMMHC.[49]  The Consulting and Non-

---

[44]  R.Ex A, pg. 17 and Ex. 1 thereto.

[45]  R.Ex A, pgs. 22, 23 and Ex. 15 thereto; R.ExD; R.Ex E.

[46]  R.ExA, pgs. 18-21,Ex. 2 thereto, pg. 9.

[47]  R.ExA, pg. 22,32,58; R.ExB, pgs. 18, 19, 30, 46, 48 and 49.

[48]  R.ExA, pg. 22, 32,58;R.Ex B, pgs. 18, 19, 30, 46, 48 and 49.

[49]  R.ExA, pgs. 18-21, Ex. 2thereto; R.Ex B, pgs. 22-24.

Competition Agreement had a three year term which began on January 2, 1998.[50] Under the terms of the Consulting Agreement, Et Al was to maintain possession of the Permit for a period of three years in exchange for $10,000 from SMMHC. The Agreement provides, in part:

> Consultant [Joseph Pellar] shall maintain or cause Et Al to maintain the liquor permit/license [RR45-16715] for the "Time-Out Sports Bar" so that the Time-Out Sports Bar may be operated at Fitness Center [Omni-41] in the same or similar manner as it was prior to Company [SMMHC] buying Fitness Center. [R.ExA, Ex. 2 thereto, pgs. 1-2, ¶2d.]

> **Term and Termination:** This Agreement shall begin on January 1, 1998, and, except as provided below, shall continue for three (3) years. . . . [R.ExA, Ex 2 thereto, p. 3, ¶5.]

> **Et Al Liquor Permit/License:** For three (3) years from January 1, 1998, Et Al shall maintain the liquor permit/license for the Time-Out Sports Bar so that the Time-Out Sports Bar may be operated at Fitness Center in the same or similar manner as it was prior to Company buying Fitness Center. In consideration for maintaining the liquor permit/license for the Time-Out Sports Bar, Company shall pay Et Al Ten Thousand Dollars and no/100 ($10,000.00). [R.ExA, Ex 2 thereto, p. 7, ¶16.)

[R.ExA, Ex. 2 thereto, pgs. 1-4 and 7; R.ExB, pg. 23.] Omni-41 is now owned and operated by SSFHS.[51]

On November 12, 1998, Robert Stiglich formed The Sunshine Boys, Inc. ("TSB"). The original shareholders of TSB were Thomas Fife, Jeff Heuertz and Robert Stiglich.[52] In 1999, Marci Crozier, the Manager of Omni-41, and Sharon Sporman, the Executive Director of Omni-41, met with Tom Fife and Jeff Heuertz to discuss the idea of adding an upscale restaurant and lounge to Omni in place of the Time-Out. Fife and Stiglich did not have a liquor license to

---

[50] R.ExA, Ex.2 thereto, pgs.1-3; R.ExB, pgs. 22-24.

[51] R.ExA, pgs. 4-5.

[52] R.ExH,Verified Complaint ¶ 6.

operate the restaurant and lounge discussed for Omni-41. As part of the overall development of Omni-41, Crozier and Sporman felt an upscale restaurant would be beneficial to the facility. [53] Fife, Heuertz and Stiglich were interested in the idea of managing an upscale restaurant and lounge owned by SMMHC on the second floor of Omni-41 in place of Time Out, which would become known as the "Woodhollow Loft Bar and Grill."[54]

In approximately the Spring of 1999, Barb Greene, then Vice President of Business Development at SMMHC, began negotiating the terms of an agreement with Fife and Heuertz to bring Woodhollow to Omni. Ultimately, the parties decided to structure the transaction as a lease, with a substantial commitment by SMMHC to upgrade the space to accommodate a full-scale restaurant.[55]

In April 1999, SMMHC entered into a lease ("Lease") with TSB of approximately 6,300 square feet of Omni-41 to operate the Woodhollow Loft Bar and Grill ("Leased Premises") in the space previously occupied by Time Out.[56] The Commencement Date of the Lease (as defined in the Lease) was July 1, 1999. The Lease called for substantial improvements to the Leased Premises, including, among other things, installation of all new kitchen equipment, new food preparation equipment, remodeling the existing bar, new booths, chairs and tables, new air conditioning and heating equipment, a new second-story loft, new electrical wiring and fixtures, a new elevator shaft and mechanical room and new floor coverings and wall treatments.

---

[53] R.ExH, Verified Complaint ¶ 7.

[54] R.ExH, Verified Complaint ¶ 8.

[55] R.ExH, Verified Complaint ¶ 9.

[56] R.ExH, Verified Complaint ¶ 10.

SMMHC paid over $400,000 towards the improvements, which were constructed over the summer and fall of 1999. The term of the Lease was five years.[57]

Jeffrey Heuertz incorporated Woodhollow on or about May 18, 1999. The original shareholders in Woodhollow were, Thomas Fife, Jeff Heuertz and Robert Stiglich.[58] Woodhollow is not and never has been a party to the Lease.[59] Et Al, Inc. transferred the Permit to Woodhollow on August 30, 1999 without condition, reservation or right of reversion. The transfer provides:

> Whereas Woodhollow Loft Bar & Grill has made an application with the Indiana Alcoholic Beverage Commission requesting that a certain . . . permit . . . be transferred to said applicant, and, whereas the Indiana Alcoholic Beverage Commission is now considering the granting of said transfer of such permit as aforesaid, I hereby formally give my consent to this transfer subject to the approval of the Indiana Alcoholic Beverage Commission and to surrender my permit on completion of transfer.
>
> s/ Joseph J. Pellar

[R.ExA, pgs. 22, 23, 24, Exs. 15 and 16 thereto; R.ExD; R.ExE; R.ExH, Verified Complaint ¶ 17.]

SMMHC asked Pellar to transfer the Permit.[60]  Fife, Heuertz and Stiglich understood that the Leased Premises came with a liquor license. Tom Fife and Jeff Heuertz, shareholders in both TSB and Woodhollow believed that SMMHC conveyed the liquor license to Woodhollow for the

_____

[57]  R.ExH, Verified Complaint ¶ 12.

[58]  R.ExF, Woodhollow Admissions, ¶¶ 2 & 3; R.ExH, Verified Complaint ¶ 11.

[59]  R.ExB, pg. 50.

[60]  R.ExA, pg. 21, 55; R.ExB, pg.34; R.ExF, Woodhollow Admissions ¶ 19; R.ExH, Verified Complaint ¶ 17.

purposes of renting the Woodhollow space.[61]  No sums were paid by either TSB or Woodhollow, Inc. to Et Al for the transfer of the Permit.[62]

The Woodhollow Loft Bar and Grill opened for business on approximately September 20, 1999.[63]  TSB never operated the Woodhollow Loft Bar and Grill and was administratively dissolved by the Indiana Secretary of State on August 15, 2002.[64]  To the extent they were made, rent payments for the Leased Premises were made by or on behalf of Woodhollow.[65]

Woodhollow occupied the Leased Premises from October of 1999 until July 31, 2007.[66]  Woodhollow operated the business establishment located in the Leased Premises from October of 1999 until July 31, 2007.[67]  Woodhollow employed the employees who worked at the Woodhollow Loft Bar and Grill located in the Leased Premises from October of 1999 until July 31, 2007.[68]

---

[61]  R.ExJ, Fife Dep. Pg. 66, ln:8; R.ExK, Heuertz Dep. Pg. 20, lines 8 to 21;R.ExH, Verified Complaint ¶ 19.

[62]  R.ExF, Woodhollow Admissions, ¶ 22 to 24.

[63]  R.ExH, Verified Complaint ¶ 13.

[64]  R.ExH, Verified Complaint ¶ 15; R.ExF, Woodhollow Admissions, ¶ 10.

[65]  R.ExF, Woodhollow Admissions, ¶ 11.

[66]  R.ExF, Woodhollow Admissions, ¶ 12; R.ExL, Docket Entry 66, Agreed Order Resolving (1) St. Margaret Mercy's Motion for Relief From Stay and Abandonment of Real Property, and (2) Debtor's Application for Order Granting Authorization to Assume Month-to-Month Tenancy ("Agreed Bankruptcy Order") ¶ 1.

[67]  R.ExF, Woodhollow Admissions, ¶ 13; R;ExL, Agreed Bankruptcy Order ¶ 1.

[68]  R.ExF, Woodhollow Admissions, ¶ 14; R.ExL, Agreed Bankruptcy Order ¶ 1.

To the extent that they were paid, Woodhollow paid food and liquor vendors who provided food and liquor that was sold at the Woodhollow Loft Bar and Grill from October of 1999 until Woodhollow vacated the Premises.[69]  Section 8.1(S) of the Lease required SMMHC to transfer a liquor license to the tenant and required that the liquor license be transferred back to SMMHC upon termination of the Lease.[70]  SMMHC caused the Permit to be transferred to Woodhollow as part of the transaction constituting SMMHC's leasing of the Premises for the operation of the Woodhollow Loft Bar and Grill. [71]  Woodhollow accepted transfer of the Permit in order to operate the Woodhollow Loft Bar and Grill.[72]

Woodhollow never paid any consideration to any person, corporation or other entity for the transfer of the Permit.[73]  Woodhollow did not purchase or otherwise pay SMMHC for the Permit or the transfer of the Permit.[74]  Woodhollow did not purchase or otherwise pay Et Al for the Permit or the transfer of the Permit.[75]  Woodhollow did not purchase or otherwise pay Joseph Pellar for the Permit or for transfer of the Permit.[76] Woodhollow did not purchase or otherwise pay any person, corporation or other entity related to Joseph Pellar for the Permit or

---

[69]  R.ExF, Woodhollow Admissions, ¶ 15.

[70]  R.ExH and Ex.A thereto, pg. 16.

[71]  R.ExF, Woodhollow Admissions, ¶ 19.

[72]  R.ExF, Woodhollow Admissions, ¶ 20.

[73]  R.ExJ, Fife Dep. Pg. 66, ln:8; R.ExK, Heuertz Dep. Pg. 20,lines 8 to 21; R.ExF, Woodhollow Admissions, ¶ 21 to 24.

[74]  R.ExF, Woodhollow Admissions, ¶ 21.

[75]  R.ExF, Woodhollow Admissions, ¶ 22.

[76]  R.ExF, Woodhollow Admissions, ¶ 23.

the transfer of the Permit.[77]

On August 9, 2001, SMMHC filed suit against TSB and Woodhollow in the Lake Superior Court as Cause No. 45D05-0108-CP-384, seeking termination of the Lease, possession, accounting, damages and specific performance.[78]  On August 24, 2001, SMMHC, TSB and Woodhollow entered into an agreement relating to prejudgment possession ("Agreed Order"). TSB and Woodhollow agreed to pay $100,000.00 to SMMHC in two equal installments. TSB and Woodhollow also agreed under the Agreed Order to commence paying, as of September 1, 2001, current amounts due as fixed minimum rent, as provided in the Lease.[79]

On August 27, 2001, the Lake Superior Court approved the Agreed Order presented by SMMHC at the August 24, 2001 hearing.[80]  The Agreed Order further provided that in the event that TSB and Woodhollow failed to comply with the Agreed Order, SMMHC would be entitled to immediate possession of the Leased Premises and the return of the Permit which had been transferred pursuant to the Lease.[81]

On or about August 31, 2001 Woodhollow paid the first $50,000 installment to SMMHC and on or about September 30, 2001 Woodhollow paid the second installment to SMMHC.[82]  All fixed rent payments due after the date of the Agreed Order have been paid in a

---

[77]  R.ExF, Woodhollow Admissions, ¶ 24.

[78]  R.ExH, Verified Complaint, ¶ 25.

[79]  R.ExI, Verified Motion of St. Margaret Mercy Healthcare Centers for Relief from Stay and Abandonment of Real Property ("Verified Motion"), ¶ 15 and Ex B and G attached thereto.

[80]  R.ExI, Verified Motion, ¶ 17.

[81]  R.ExG, pg. 2.

[82]  R.ExI, Verified Motion ¶ 17; R.ExM.

16

timely fashion.[83] On January 12, 2004, Woodhollow attempted to exercise an option to extend the Lease for five additional years.[84]

In various applications and statements prepared by SMMHC's counsel and filed with the Indiana Alcohol and Tobacco Commission, SMMHC indicated that it did not own any interest in the Permit.[85] SMMHC never made a demand of Et Al or Pellar for the return of the Permit.[86] Woodhollow, Inc. has continuously held the Permit since August 30, 1999.[87] According to records maintained by the Indiana Alcohol & Tobacco Commission, neither SMMHC nor SSFHS have been holders of the Permit or are within the chain of title.[88]

A wholly owned subsidiary of SSFHS, SMMHC purchased Indiana Type 210-1 Retailer Alcoholic Beverage Permit No. RR45- 19450 ("SMMHC Permit") at an auction in 2001 as cover because its executives believed the Permit was in jeopardy.[89] In its October 21, 2001 application which led to the purchase of RR45-19450, SMMHC made the following representation to the Indiana Alcohol and Tobacco Commission:

> Do any of the above Officers, Directors or Stockholders hold any other permit of any kind connected with alcoholic beverages in Indiana; or do they have any

---

[83] R.ExM.

[84] R.ExF, pg. 6, ¶6 and Ex 2 thereto and Ex. A and B thereto.

[85] R.ExA, pgs. 25-28, 53-55.

[86] R.ExB, pg. 25.

[87] R.Ex A, pgs. 22-24, Ex. 15 thereto; R.ExD; R.ExE.

[88] R.ExA-pgs. 22-24, Ex. 15 thereto; R.ExD; R.ExE.

[89] R.ExA, pgs. 25-31; R.ExB, pgs. 39, 40, 41, 42, 49 to 50.

interest in any such permit, directly or indirectly,
through ownership of corporation stock, or otherwise?
(If Yes, explain.)

___ Yes _X_ No

[R.ExA, pgs. 24-32, Ex. 5 thereto, pg.7 (pg. 4 of application).]

The SMMHC Permit was held in escrow for more than two years after its purchase.[90]  SMMHC never utilized the SMMHC Permit and eventually conveyed it to a third-party.[91]

The Gross Sales (as defined in the Lease) at Woodhollow for Lease Years 1 through 5 (as defined in the Lease) totaled $6,645,657. Percentage Rent under the Lease totaled $303,716. Interest on the Percentage Rent due from its due date to the date Debtor filed is Petition equals $178,901.[92]  Attorneys fees incurred by SMMHC to collect the past due rent under the Lease totaled $292,950.55 and additional costs totaled $15,000.[93]  Section 10.2 of the Lease states that "All sums of money or other charges payable by Tenant under this Lease, whether or not designated as such, shall be deemed additional rent."[94]

SSFHS has offered the following additional facts that it states are relevant to the appeal, many of which are summary reiterations of the agreed facts recited above.

SMMHC operated two hospitals in Lake County, Indiana in 1998. In January of 1998,

---

[90]  R.ExA, pg. 24, 30, Ex. 5 thereto, 6; R.ExB, pg 41-42.

[91]  R.ExA, pg. 30-32; R.ExB, pgs. 41-42.

[92]  R.ExI, Verified Motion, ¶ 18, 19.

[93]  R.Ex I, Verified Motion, ¶ 20, 21.

[94]  R.ExH and R.ExA thereto, pg. 21.

SMMHC purchased Omni 41 Health and Fitness Centre ("Omni 41") for several million dollars.[95] Omni 41 is a large fitness center, roller skating rink and racquet club.[96] The previous owners of Omni 41 operated a small sports bar in the facility known as Time Out.[97] One of the previous owners, Et Al, Inc, held an alcoholic beverage permit – Indiana Alcoholic Beverage Permit RR45-16715 (the "Permit") – that it used at Time Out.[98] Rather than acquire the Permit, SMMHC arranged to have it held in Et Al's name for three years.[99] Before the three years expired, SMMHC refurbished and upgraded Time Out and leased the space (the "Leased Premises") to TSB pursuant to a written Lease Agreement ("Lease").[100] Section 8.1(S) of the Lease states:

> As permitted by Law, Landlord shall transfer a liquor license to Tenant upon execution of this Lease Agreement. Upon expiration or termination of this Lease Agreement Tenant shall work with Landlord to transfer the liquor license back to Landlord.

[R. Ex. H, Ex. A attached thereto, pg. 16].

Contemporaneously with the lease transaction between SMMHC and TSB, Et Al transferred the Permit to Woodhollow, which took possession of the Leased Premises and operated a restaurant and bar, named the Woodhollow Loft, in the Leased Premises.[101]

---

[95]  R. Ex. A, Ex. 1 attached thereto, p.8.

[96]  R. Ex. A, Ex. 1 attached thereto.

[97]  R. Tab A, pg. 2, ¶3.

[98]  R. Tab A, pg. 2 ¶4.

[99]  R. Tab A, pg. 2, ¶ 7; Ex. A, pg. 55.

[100]  R. Tab A, pg. 4-5, ¶¶ 16-18.

[101]  R. Tab A, ¶¶ 21, 29.

Woodhollow consisted of the same three shareholders as TSB, namely, Tom Fife, Jeff Heuertz and Bob Stiglich.[102]  SMMHC  merged into SSFHS in January of 2002, making SSFHS a party to the Lease Agreement with TSB.[103]  It is undisputed, and Woodhollow has admitted under oath, that it:

- never paid any consideration to any person, corporation or other entity for the transfer of the Permit;

- accepted transfer of the Permit as part of the lease transaction with SMMHC in order to operate the Woodhollow Loft Bar and Grill; and

- did not purchase or otherwise pay SMMHC, Et Al., Inc., Joseph Pellar, or any person, corporation or other entity related to Joseph Pellar for the Permit or the transfer of the Permit.

[R. Ex. F, pg. 4-5, ¶¶ 18-24]

Gene Diamond was the President of SMMHC in 1998, the year in which it acquired Omni 41. He testified:

We asked [Joseph Pellar] to transfer that license to the folks who were going to be running Woodhollow. He graciously agreed to do so pursuant to our request.

That did happen. The folks in Woodhollow understood as it was coming into their hands from his hands that it was our license. They accepted it on that basis. They would not otherwise have gotten a lease at that location unless they had specifically agreed to accept it under those conditions.

[R. Ex. A, pg. 55]. The testimony of Barbara Greene, the Vice President of Business Development for SMMHC, and Marci Crozier, the General Manager of Omni 41, was

---

[102]  R. Tab, ¶¶ 13, 19.

[103]  R. Tab A, pg. 1, ¶ 1.

consistent with Diamond's description.[104]  Tom Fife, one of the original three shareholders in

both TSB and Woodhollow, similarly testified that Woodhollow did not purchase the liquor

license and merely "[l]eased the license under the lease" with SMMHC.[105]

It is also undisputed, and Woodhollow has consistently maintained the position through

its words and conduct, that it is the "tenant" under the operative Lease with SMMHC. As

early as April 9, 2002, Jack Weichman ("Weichman"), a shareholder in Woodhollow, wrote a

letter to SMMHC requesting a meeting to discuss "Lease issues" associated with Woodhollow's

occupancy of the Leased Premises.[106]  The rent payments made by Woodhollow each year

correspond directly with the payments called for in Section 4.1(a) of the Lease, which provides

for rent escalations based upon the Consumer Price Index.[107]  Based upon an August 7, 2002

letter to SMMHC, Woodhollow believed it needed SMMHC's permission "pursuant to the terms

of the Lease" to install an automatic teller machine and a go-go dance platform inside the Leased

Premises.[108]

By correspondence of January 12, 2004, Woodhollow attempted to exercise an option for

five additional years under the Lease and wrote:

> Pursuant to the terms of the above-referenced lease, please be
> advised that we intend to exercise the option of renewing our lease
> for an additional five (5) year term.

---

[104]  R. Ex. B, pg. 7, 54, 31, 33 and Exhibit 9 attached thereto; R. Ex. N, pg. 17.

[105]  R. Ex. J., pg. 66.

[106]  R. Ex. F, Ex. 3 attached thereto.

[107]  R. Ex. H, Ex. A attached thereto, pg. 6.

[108]  R. Ex. F, pg. 6 ¶ 5.  As noted, SMMHC refused to permit the ATM or the dance
platform.

[R. Ex. F, pg. 6 ¶ 4] (emphasis added). When SSFHS (which by this time had merged SMMHC into itself)[109] rejected Woodhollow's attempt to exercise an option, Woodhollow filed a Petition for Declaratory Judgment in the underlying state court action.[110]   In paragraph 5 of the Petition, Woodhollow stated that it was "the assignee and/or successor-in-interest of The Sunshine Boys and has been continuously in possession as the tenant of the subject premises."[111].

Things did not go well for the Woodhollow Loft, and SMMHC filed suit in state court against Woodhollow and TSB for back rent, an accounting and possession of the Leased Premises ("State Court Proceeding"). On August 24, 2001, SMMHC, TSB, and Woodhollow entered into an agreement staving off prejudgment possession of the Leased Premises ("Agreed Order"). In addition to providing for the payment of past due rent, the Agreed Order states:

> Upon failure to pay the above referenced sums, the plaintiff shall
> have the right to pre-judgment possession of the property subject to
> the Lease (the restaurant site currently occupied by the Defendant(s)
> and located at 221 Rt. 41, Schererville, Indiana 46375), including the
> Leased Premises, and the Alcoholic Beverage Type-210 Restaurant
> (Liquor, Beer and Wine Retailer) Permit No. RR45-16715 which
> was transferred to the defendants pursuant to the Lease attached to
> plaintiff's complaint as Exhibit "A".

[R. Stmt of Undisputed Facts, ¶ 41, Ex I, Ex B attached thereto]. On the eve of trial in the State Court Proceeding, Woodhollow filed for bankruptcy protection, which case is pending before the United States Bankruptcy Court for the Northern District of Indiana as Case No. 07-20206-jpk (the "Main Case").

On March 21, 2007, SSFHS filed in the Main Case its Verified Motion of SMMHC for

---

[109]  R. Stmt. of Undisputed Facts, ¶ 1.

[110]  R. Ex. S.

[111]  R. Ex. S, p. 1.

Relief from Stay and Abandonment of Real Property (the "Relief from Stay Motion").[112]  The

Relief from Stay Motion, among other things, sought relief from stay with respect to the Leased

Premises and evidenced SSFHS' demand upon Woodhollow for unpaid rent.[113] On June 6, 2007,

Woodhollow, as debtor-in- possession, filed in the Main Case an Application for Order Granting

Authorization to Assume Month to Month Tenancy (the "Application to Assume"),[114] to which

SSFHS objected on the grounds, inter alia, that Woodhollow was liable for all rent owed with

respect to the Leased Premises.[115]

On June 27, 2007, the Bankruptcy Court held an evidentiary hearing on both of these

matters.[116]  Following the evidentiary hearing, the parties agreed to and the Court, on July 17,

2007, entered an Agreed Order Resolving (1) SMMHC's Motion for Relief from Stay and

Abandonment of Real Property, and (2) Debtor's Application for Order Granting Authorization

to Assume Month to Month Tenancy.[117]  On January 10, 2008, SSFHS filed its Amended Proof

of Claim, amending the proof of claim informally set forth in the Relief from Stay Motion[118]

to which Woodhollow objected.[119] Woodhollow vacated the Leased Premises at Omni 41

---

[112]  R. Ex. I.

[113]  Id., ¶¶ 12-21.

[114]  BD, Docket Entry No. 50.

[115]  BD, Docket Entry No. 58.

[116]  R. Ex. C.

[117]  R. Ex. L.

[118]  R. Ex. P.

[119]  R. Ex. O.

pursuant to the agreed order entered by the Bankruptcy Court but claims that it has no duty to convey the alcoholic beverage permit back to SSFHS. On December 4, 2007, SSFHS filed an adversary proceeding to determine the parties' relative rights to the Permit. This appeal arises out of the Bankruptcy Court's disposition of Woodhollow's objection to SSFHS's claim along with the adversary proceeding.

In support of its direct appeal, Woodhollow argues that the Bankruptcy Court reached legal conclusions that are not supported by the evidence as to the relationship between TSB and Woodhollow. Woodhollow further claims that the Bankruptcy Court improperly ignored the expressed terms of the Asset Purchase, Consulting and Non-Competition Agreement and Consent to Transfer, in an effort to give effect to ¶8.1(S) of the Lease. Woodhollow concludes that in doing so the Bankruptcy Court gave SSFHS control over a permit which was not issued to it and that the evidence does not support the court's conclusion that SSFHS has a right to the alcoholic beverage permit.

Woodhollow agrees that the Bankruptcy Court correctly determined that SMMHC and SSFHS had no direct interest in the Permit or any ability to right to affect its transfer.[120] However, Woodhollow argues that the Bankruptcy Court's determination that Et Al did not divest itself of all interests in the Permit when it transferred the Permit to Woodhollow is manifestly wrong. Woodhollow claims that the Bankruptcy Court erred when it concluded that it could recognize a common practice in the restaurant industry that the:

> . . .lessee or owner of the premises very often is a separate entity
> from the entity which actually operates the restaurant. It is obvious
> to the court that Woodhollow Loft, Inc. was set up as the operating

---

[120] AD 60, Memorandum, pg. 12-13, 19, 28.

> entity for the restaurant with The Sunshine Boys, Inc. as the lessee.
> This arrangement was understood by and agreed to by, SMMHC,
> Et Al, Inc. and Joseph Pellar, The Sunshine Boys, Inc. and
> Woodhollow Loft, Inc. Because the actual operator of a restaurant
> serving alcoholic beverages must be the permit holder, it was
> necessary that the permit be transferred to Woodhollow Loft, Inc.
> rather than The Sunshine Boys, Inc. as the lessee under the lease.
> That is what happened. . . .However, the lease was not assigned by
> The Sunshine Boys, Inc. to Woodhollow Loft, Inc. and there is no
> evidence of a formal sub-lease between those entities with respect
> to the premises.

Id. at 20-21.

Woodhollow additionally argues that the purported belief of the officers of TSB that SMMHC

owned or controlled the Permit is not supported by the Bankruptcy Court's own determinations

and is in conflict with the deposition testimony of two senior SSFHS representatives and the

designated January 2008 affidavits of the Commission's Executive Secretary and paralegal.[121]

Woodhollow contends that the Bankruptcy Court improperly ignored the terms of the Consent to

Transfer, executed by Et Al, the Permit holder, in favor of a lease agreement drafted by a party

that has no direct interest and questionable indirect interest in the subject Permit.

The nature or existence of the debtor's property right is a question to be determined

under state law. Robinson v. Chicago Hous. Auth., 54 F.3d 316, 320 (7th Cir. 1995). The

parties' respective interests in the Permit are governed by statute and the Commission's

administrative rules and regulations.

The Commission is vested with the powers to "prescribe the forms for all applications,

permits, licenses and other documents and records used in the administration of this title."

---

[121] R.ExA, pg. 22, 23, 24, 32,58 and Exs. 15 and 16 thereto; R.Ex B, pgs. 18, 19, 22,
23,24, 30,31, 38, 39, 40, 46, 48 and 49 and Ex. 9 and 13 thereto; R.ExD and R.ExE; R.ExH,
Verified Complaint ¶ 17.

Ind.Code §7.1-2-3-3. Ordinary transfers of alcoholic beverage permits are governed by Ind.Code

§7.1-3-24-2/-3 which provides:

> Sec. 2. Ordinary Transfers Authorized. The transfer of a permit from one (1) holder to another holder, or from one (1) location to another location may be made if the permit has at least three (3) months of unexpired term remaining.

> Sec. 3. A transfer authorized by section 2 of this chapter is subject to the following restrictions:

> (1)　It shall be made upon the terms and under the rules and regulations that the commission may prescribe.
> (2)　The application for transfer shall conform in respect to notice and publication and investigation before the local board as in the case of an original application for a permit.
> (3)　It shall be subject to the advance payment of the advance cost fee under IC 7.1-4-4.1-6.

Ind.Code §7.1-3-24-2/-3.

Woodhollow argues that the parties' respective contractual agreements also impact Woodhollow's interests in the Permit. Contract interpretation is a question of law reserved for the courts. Cherry v. Auburn Gear, Inc., 441 F.3d 476, 481 (7th Cir. 2006). "Where the language of a contract is clear and unambiguous, the intent of the parties is determined from the four corners of the instrument, giving the words contained therein, their plain, usual and ordinary meaning." Samar, Inc. v. Hofferth, 726 N.E.2d 1286, 1290 (Ind.Ct.App. 2000). "Clear, plain, unambiguous terms are conclusive of that intent. We will neither construe clear and unambiguous provisions nor add provisions not agreed upon by the parties." Kaghann's Korner, Inc. v. Brown & Sons Fuel Co., Inc., 706 N.E.2d 556, 565 (Ind.Ct.App. 1999). "The existence of express terms in a valid written contract precludes the substitution of any implied terms regarding the subject matter covered by the express terms. This principle is especially true in

Indiana because our courts will zealously defend the freedom to contract." Peoples Bank & Trust Co. v. Price, 714 N.E.2d 712, 717 (Ind.Ct.App. 1999). "When a court finds a contract to be clear in its terms and the intentions of the parties apparent, the court will require the parties to perform consistently with the bargain they made." I.C.C. Protective Coatings, Inc. v. A.E. Staley Manufacturing Co., 695 N.E.2d 1030, 1035 (Ind.Ct.App. 1998). "The proper posture for the court is to find and enforce the contract as it is written and leave the parties where it finds them." First Federal Savings Bank of Indiana v. Key Markets, 559 N.E.2d 600, 604 (Ind. 1990).

If the language utilized in the agreement is insufficient to give meaning to the contract's terms, the agreement may be deemed ambiguous and require the submission of extrinsic evidence. Plumlee v. Monroe Guar. Ins. Co., 655 N.E.2d 350, 351-52 (Ind.Ct.App. 1995) An agreement is ambiguous only if it is susceptible to more than one interpretation, so that reasonably intelligent people could come to different conclusions as to its meaning. Bastin v. First Indiana Bank, 694 N.E.2d 740, 746 (Ind.Ct.App. 1998). A contract is not ambiguous just because the parties favor their own distinct interpretations. Id.

Woodhollow maintains that the bankruptcy court erred by diminishing the import of the terms and conditions imposed under the Asset Purchase and the Consent to Transfer. Woodhollow points out that in paragraph 1.3(g) of the Asset Purchase, the Permit is expressly excluded from the transaction.[122] Woodhollow claims that the terms of the Consent are similarly clear.[123] Thus Woodhollow concludes that there is no suggestion that the terms of the Asset

_____

[122] R.Ex A, pg. 17, Ex. 1, pgs. 4-5; R.Ex B, pgs. 18-23.

[123] R.ExA, pgs. 22, 23, 24, Exs. 15 and 16 thereto; R.ExD; R.ExE; R.ExH, Verified Complaint ¶ 17.

Purchase and Consent to Transfer are ambiguous or should not be enforced as drafted.

Woodhollow argues that its possession of the Permit is based on the unconditional transfer executed by Joseph Pellar, on behalf of Et Al, and that Woodhollow's continued possession of the Permit from 1999 to the present is a reflection of the existing statutory scheme. That is, while Ind.Code §7.1-3-1-2 expressly denies a permittee property rights in an alcoholic beverage permit, a permittee is entitled to possess and utilize the permit pursuant to state statute until the permit expires, is suspended , revoked or transferred with the Commission's consent. See, Ind.Code §§ 7.1-3-1 et seq., 7.1-3-23 et seq. and 7.1-3-24 et seq. Woodhollow asserts that the permittee enjoys quasi-property rights in his permit during its term subject to the Commission's oversight and approval. Honeycutt v. Ong, 806 N.E.2d 52, 58 (Ind.Ct.App. 2004).

Woodhollow contends that the Bankruptcy Court's error was compounded by the weight it gave to the incomplete and conflicting terms of the Consulting Agreement and the Lease. The term of the Lease was five years while the Consulting and Non-Competition Agreement only covered a period of three years. There is no determination as to the fate of the Permit when Pellar is no longer obligated to SMMHC in the final forty-three months of the Lease. In addition, the court ignored the fact that Pellar transferred his right to possess the Permit, subject to the Commission's regulation, approximately sixteen months before the three year term of the Consulting and Non-Competition Agreement expired.

According to Woodhollow, the Bankruptcy Court's emphasis on the importance of the 2001 Agreed Order is hampered by SMMHC's assertion of its interest in the Permit. Woodhollow argues that the evidence presented to the Bankruptcy Court did not support SMMHC's claim. Woodhollow claims that the confusion as to SMMHC's interests in the Permit

only became clear well after the fact and that there is no evidence to show that TSB or Woodhollow had knowledge of the terms of the Asset Purchase and the Consulting and Non-Competition Agreement in 1999 or anytime before the entry of the Agreed Order in August 2001. Woodhollow maintains that the evidence demonstrates that SMMHC did not have any rights in the Permit and that there is no provision in any other agreement that supports the execution of ¶8.1(S) of the Lease. Woodhollow concludes that the operation of the Consent to Transfer, in the absence of any lease or sublease involving Woodhollow, and presence of the ambiguities in the Consulting and Non-Competition Agreement preclude SSFHS from enforcing ¶8.1(S).

SSFHS, however, takes the position that the bankruptcy court correctly concluded that Woodhollow's right to use the permit ended with its right to possess the premises.

In its decision the Bankruptcy Court noted that the interests of a person in an alcoholic beverage permit constitute property of a bankruptcy estate under 11 U.S.C. § 541(a).[124] The Bankruptcy Court determined, however, that a permit is not, in and of itself, property. It represents the grant of a license by the State to the entity to whom the permit has been issued to sell alcoholic beverages at a particular location. The Bankruptcy Court determined that a permit represents two principal qualities, rights or incidents. The first is the privilege of selling alcoholic beverages on the premises upon which the permittee conducts its business. The second is the ability to transfer the permit to another owner or to another location apart from the original permit premises.[125] The Bankruptcy Court found that those two rights are severable and that it

---

[124] AD, Document 60 Memorandum of Decision, pg. 9.

[125] Id. at 10.

was necessary to consider the entire transactional history involving the Permit in order to determine which of the parties had a superior claim on them.[126]

SSFHS opines that Woodhollow essentially makes a parol evidence argument and asserts that the Bankruptcy Court should have confined its review to the Asset Purchase Agreement and the Consent to Transfer. SSFHS claims that Woodhollow's reference to the parol evidence rule is misguided for several reasons. First, the parol evidence rule is a substantive rule regarding the interpretation of contracts. Krieg v. Hieber, 802 N.E.2d 938, 943 (Ind. App. 2004). SSFHS points out that the Consent to Transfer is not a contract or an agreement, was never executed by Woodhollow, recites no consideration and does not confer rights or benefits to more than one party to it. The Consent to Transfer, on its face, indicates that it is part of a larger transaction. Second, parol evidence may be admitted and relied upon to show the nature of the consideration supporting a contract, to apply the terms of a contract to its subject matter, and to shed light on the circumstances under which the parties entered into a contract. Milner v. Mumby, 599 N.E.2d 627, 629 (Ind. App. 1992). Third, in "determining the intention of the parties to a contract a court may consider the circumstances which existed when the contract was made. It may also consider the nature of the contract and its subject matter and the apparent purpose of making the contract." American Fletcher Mortg. Co., Inc. v. Cousins Mortg. and Equity Investments, 623 F.2d 1228, 1237 (7th Cir. 1980). SSFHS concludes that since the Consent to Transfer does not actually effect the transfer of the Permit and is not itself a contract or an agreement conveying the Permit, it was not only reasonable for the Bankruptcy Court to consider the entirety of the transaction of which the Permit was a part, but essential.

---

[126] Id. at 11.

The Bankruptcy Court inferred from the evidence that TSB was formed to lease the premises and Woodhollow was formed as the operating entity for the restaurant and bar.[127] Woodhollow takes issue with the Bankruptcy Court's determination and argues that there is no evidence to support the Bankruptcy Court's finding. SSFHS, however, first notes that the finding is not determinative to the Bankruptcy Court's ruling and, ultimately, the Bankruptcy Court determined that an agreement existed among all of the parties that the Permit would remain at Omni 41 upon termination or expiration of the lease.[128] As discussed more fully below, there is ample evidence in this record to support that determination. While Judge Klingeberger drew on his legal experience in the restaurant and alcoholic beverage industry, he was merely making a reasonable factual inference to reconcile several pieces of inconsistent evidence. While TSB executed the Lease, Woodhollow readily admitted that: (1) it made the rent payments under the Lease, (2) it occupied the Leased Premises, (3) it operated the Woodhollow Loft in the Leased Premises, (4) it employed the employees at Woodhollow Loft, and (5) it paid the food and liquor vendors who provided the food and liquor that was sold at the Woodhollow Loft.[129] There must have been some reason why one corporation set up by Fife, Heuertz and Stiglich leased space from SMMHC and another corporation set up by the same three men at about the same time accepted transfer of a liquor license, operated a restaurant and bar in the space and paid the rent under the lease (more or less). Clearly, the Bankruptcy Court's explanation is reasonable and is based on evidence in the record.

---

[127] AD, Document 60 Memorandum of Decision, pg. 20.

[128] AD, Document 60 Memorandum of Decision, pg. 21.

[129] R. Ex. F, ¶¶ 11 – 15.

The pivotal factual finding by the Bankruptcy Court was that an agreement existed among all of the parties that the Permit would remain at Omni 41 upon termination or expiration of the Lease.[130] The evidence in this case supports this finding. Woodhollow admitted that it did not pay any person any consideration for the transfer of the Permit.[131] Instead, Woodhollow admitted that "St. Margaret Mercy caused the Liquor License to be transferred to Woodhollow Loft, Inc. as part of the transaction constituting St. Margaret Mercy's leasing of the Leased Premises for the operation of the Woodhollow Loft Bar and Grill."[132] That transaction included the Lease. The Lease obligated the Landlord to convey a liquor license to the tenant and required the tenant to convey the license back at the conclusion of the Lease. Gene Diamond, President of SMMHC, testified that is exactly what happened. SMMHC preferred not to have the Sisters of St. Francis own a liquor license directly and paid Joe Pellar to hold it until such time as the Time Out Sports Bar could be converted into a more upscale restaurant, the Woodhollow Loft. When the time was right, SMMHC directed Joe Pellar to convey the Permit, and he did so. The Agreed Order entered into by Woodhollow, TSB and SMMHC merely confirmed what the parties had agreed to from the beginning: once the Lease was over, the Permit would transfer to SMMHC.

The Bankruptcy Court's determination that SMMHC would not have promised to transfer the Permit if it had not obtained the consent of Et Al, Inc. and Pellar to do so[133] is an entirely reasonable inference to draw based upon the evidence in the record. Woodhollow has

---

[130]  AD, Document 60 Memorandum of Decision, pg. 21.

[131]  R. Ex. F, pg 4-5, ¶¶ 18, 21, 22, 23, 24.

[132]  R. Ex F, pg.4 ¶ 19.

[133]  AD, Document 60 Memorandum of Decision, pg. 20.

not offered any other plausible explanation because it has already admitted that SMMHC arranged to have the Permit transferred to it, and it accepted it, for the purpose of operating the business establishment in the Leased Premises at Omni 41. The Bankruptcy Court's determinations relating to the intent of the parties in the lease transaction leads to its natural conclusions regarding the nature and extent of Woodhollow's interests in the Permit. The Bankruptcy Court ultimately concluded that Woodhollow never acquired the right to convey or relocate the Permit and its right to use the Permit to sell alcoholic beverages on the Leased Premises was limited by its right to lawfully occupy the Leased Premises. This court finds no error in the Bankruptcy Court's reasoning or conclusions and, therefore, this portion of the Bankruptcy Court's decision will be affirmed.

SSFHS has raised the issue via cross-appeal whether the Bankruptcy Court correctly determined that SSFHS has no allowable claim against Woodhollow because its claim was untimely. SSFHS argues that the Bankruptcy Court's decision in this regard is wrong for two reasons. First, SSFHS' claim, in part, arose out of an unexpired lease and, as such, could be filed within such time as the Bankruptcy Court may direct. Second, SSFHS' claim related back to the filing of its informal proof of claim against Woodhollow on March 21, 2007. SSFHS contends that under either argument, its claim against Woodhollow was timely and allowable.

SSFHS' argues that its January 10, 2008 Amended Proof of Claim (Claim No. 5) (hereinafter the "SSFHS Claim") arose, in part, out of the rejection of an executory contract or unexpired lease of the Debtor as contemplated by 11 U.S.C. § 365 and Fed. R. Bankr. P. 3002(c)(4); therefore, the SSFHS Claim could be filed within such time as the Bankruptcy Court may direct. SSFHS argues that inasmuch as the Bankruptcy Court's July 17, 2007 order rejected

the parties' rental agreement for Woodhollow's use and occupancy of the Leased Premises, and the Court had not set a deadline pursuant to Fed. R. Bankr. P. 3002(c)(4) by which lease rejection claims must be filed, the SSFHS Claim was timely filed.

Fed. R. Bankr. P. 3003 sets forth the general rule for when a proof of claim in a Chapter 11 bankruptcy case must be filed:

> The court shall fix and for cause shown may extend the time within which proofs of claim or interest may be filed. Notwithstanding the expiration of such time, a proof of claim may be filed to the extent and under the conditions stated in Rule 3002(c)(2), (c)(3), (c)(4), and (c)(6).

Fed. R. Bankr. P. 3003(c)(3). An exception to the general rule of Fed. R. Bankr. P. 3003 allows for a claim, which arises from the failure to assume a debtor's agreement to use or occupy real property, to be filed after such agreement is rejected. See Fed. R. Bankr. P. 3002(c)(4) ("[a] claim arising from the rejection of an executory contract or unexpired lease of the debtor may be filed within such time as the court may direct."). Like "executory contract," the term "unexpired lease" is not defined in the Bankruptcy Code; however, it encompasses agreements related to the use or occupancy of real property beyond those specifically denominated as a "lease." See 11 U.S.C. §365(m) ("[f]or purposes of this section 365…, leases of real property shall include any rental agreement to use real property."); see also, 3 Collier On Bankruptcy, ¶ 365.13, (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.) (Pursuant to Section 365(m), "an agreement not denominated a "lease" but providing a right to use or occupy real property is subject to the provisions governing real property leases"). Pursuant to Fed. R. Bankr. P. 2002(a)(7) and 2002(f)(3), respectively, the deadline for filing claims under Fed. R. Bankr. P. 3003 and 3002 cannot pass without notice being given.

The Bankruptcy Court concluded, "that there was in fact no executory lease or other

contract between" SSFHS and Woodhollow. However, SSFHS argues that Woodhollow's use

and occupancy of the Leased Premises clearly was pursuant to some kind of a rental agreement

between SSFHS and Woodhollow, which rental agreement is within the scope of the Bankruptcy

Code's contemplation of an "unexpired lease." See 11 U.S.C. §365(m). As quoted in the

Bankruptcy Court's opinion, the Agreed Order provided, among other things,

> As of September 1, 2001, [Woodhollow] shall begin paying current
> amounts due as fixed minimum rent under the Lease Agreement.
>
> Upon failure to pay the above referenced sums, [SSFHS] shall have
> the right to pre-judgment possession of the property subject to the
> Lease.

AD, Document 60 Memorandum of Decision, pg. at 22-23. Woodhollow has conceded that the

Agreed Order is a contract between SSFHS and Woodhollow that addresses the payment of rent

for the Leased Premises. The Bankruptcy Court, prior to rendering its opinion, also described the

Agreed Order as an unexpired executory agreement governing possession of real property as

contemplated by 11 U.S.C. §365 and the Bankruptcy Rules :

> whether one wants to refer to it as a lease or some other
> arrangement for the occupancy of property owned by another, it's
> the same concept. It's an executory arrangement between two
> parties that allowed one to occupy the premises in exchange for
> payment of something to the other side.

R. Ex. C, p. 13, ln. 20 – ln. 25.  SSFHS argues that the Bankruptcy Court provides little analysis

or explanation of why what has been clearly identified by the parties, and the Bankruptcy Court

itself, as a rental agreement for the use and occupancy of real property, subsequently should be

overlooked for purposes of determining the timeliness of SSFHS's Claim.

Next, SSFHS argues that the Bankruptcy Court seems to suggest that the Agreed Order

was not "rejected" because Woodhollow filed a motion to assume it, which motion was resolved

by the Bankruptcy Court's approval of "the parties' agreement as to the terms of cessation of occupancy by Woodhollow of space at Omni 41."[134]  SSFHS contends that the Bankruptcy Court fails to explain how "cessation of occupancy" differs from rejection of a rental agreement, or an unexpired lease. Moreover, the Bankruptcy Code makes clear that any unexpired lease that is not assumed shall be rejected. See 11 U.S.C. §365(d)(4).  SSFHS argues that the Bankruptcy Court seems to suggest that an unexpired lease can be neither assumed nor rejected; however, the Bankruptcy Court  has not explained what the status of such a lease would be, nor has it reconciled this alternative with the clear dictates of the Bankruptcy Code. SSFHS claims that once the Agreed Order was not timely assumed, the only available conclusion consistent with the Bankruptcy Code is that the state court Agreed Order was rejected pursuant to the Bankruptcy Court's July 17, 2007 entry. Because the state court Agreed Order was not rejected until July 17, 2007, SSFHS argues that it could not have filed a final claim arising out of that rejection prior to the previously-set June 14, 2007 claims bar date. The Bankruptcy Rules expressly provide for the common situation in Chapter 11 cases where a lease rejection claim may arise after a Chapter 11 proof of claim bar date already has passed. The Bankruptcy Court has not set a deadline pursuant to Fed. R. Bankr. P. 3002(c)(4) by which executory contract and lease rejection claims must be filed. Thus, concludes SSFHS, the SSFHS Claim was filed timely and properly manifested SSFHS's claim in the Main Case.

SSFHS also argues that its Amended Proof of Claim was timely filed by virtue of its relation back to the timely filing of SSFHs' informal proof of claim. Specifically, SSFHS contends that while the SSFHS Claim stands on its own as a timely-filed proof of claim pursuant

---

[134]  AD, Document 60 Memorandum of Decision, pg. 32.

to Fed. R. Bankr. P. 3002(c)(4) by virtue of the rejection of the Agreed Order, it also serves as an amendment of SSFHS's prior informal claim (the "Informal Claim"), which SSFHS originally manifested on March 21, 2007 by virtue of the Relief from Stay Motion. SSFHS argues that, by relying upon an overly-narrow view of the "informal proof of claim" doctrine in the Seventh Circuit, the Bankruptcy Court erred when concluding that SSFHS's Claim was not timely filed by virtue of its relation back to the timely filing of SSFHS's Informal Claim.

According to SSFHS, the Bankruptcy Court endorsed standards for applying the informal proof of claim doctrine that are much narrower than the current state of the law in the Seventh Circuit and seems to have based its denial of SSFHS's Informal Claim on that narrow application. SSFHS urges that, since the review of the Bankruptcy Court's legal conclusions are de novo, this Court is free to reach a contrary conclusion which it claims would be more in line with the guidance provided by the Seventh Circuit.

The Bankruptcy Court suggested that the extent of the informal proof of claim doctrine in the Seventh Circuit is in doubt since the United States Court of Appeals's decision in In re Greenig, 152 F.3d 631 (7th Cir. 1998), and then relied upon the narrow standards articulated in In re Fink, 366 B.R. 870 (Bankr. N.D.Ind. 2007), to deny recognition of SSFHS's Informal Claim.[135] The Greenig court analyzed whether, in a Chapter 12 bankruptcy case, creditors who never filed any proof of claim, informal or otherwise, could rely upon the terms of a debtor's plan of reorganization to circumvent the requirement of filing a proof of claim. See In re Greenig, 152 F.3d, at 635-636 (concluding that a judge in equity could not permit an entirely new claim filed out of time). SSFHS points out that there is no indication in Greenig that the

---

[135] AD, Document 60 Memorandum of Decision, pg. 32-36.

creditor argued it had filed an informal proof of claim and that the opinion indicates that the creditor never filed any proof of claim. Thus SSFHS concludes that the Greenig court did not address, or even raise, the informal proof of claim doctrine and therefore gave no explicit reason to question the availability of the informal proof of claim doctrine in a Chapter 11 bankruptcy case.

SSFHS further contends that recent decisions decided after Greenig by the United States of Court of Appeals for the Seventh Circuit have confirmed the continued availability of the informal proof of claim and have given no indication that Greenig has called the doctrine into question. See In re marchFIRST, Inc., 573 F.3d 414, 418 (7th Cir. 2009) ("The informal proof-of-claim doctrine is an equitable doctrine that permits bankruptcy courts to treat a creditor's late formal claim as an amendment to a timely informal claim"); see also, In re Boone County Utilities, LLC, 506 F.3d 541, 545 (7th Cir. 2007) (acknowledging that equity may demand that a previously filed document be considered an informal proof of claim "because it is the only way a creditor can recover on a legitimate debt"). SSFHS notes that the Bankruptcy Court seems to prefer a more narrow application of the doctrine, if at all, and suggested that an informal claim should be limited to a defective claim.[136] SSFHS contends that other courts in the Seventh Circuit, including the Court of Appeals, have taken a more expansive view. See, e.g., In re Luis Gonzalez, Jr., 295 B.R. 584, 588 (Bankr. N.D. Ill. 2003) ("a document not actually intended as a proof of claim (and so not labeled 'proof of claim' or consisting of the official form) will sometimes be taken as an 'informal proof of claim'"); see also, Wilkens v. Simon Bros., 731

---

[136] AD, Document 60 Memorandum of Decision, pg. 34; citing, In re Fink, 866 B.R., at 876-877 (Bankr. N.D.Ind. 2007).

F.2d 462, 465 (7th Cir. 1984) ("a claim arises where the creditor evidences an intent to assert its claim against the debtor" and a "creditor can manifest its intent to hold a debtor liable in many ways, and the particular facts of a case will determine whether such a de facto claim has been made"). Whether an amendment will be allowed to relate back to the date of an earlier informal claim is a matter committed to the court's discretion. Matter of Stavriotis, 977 F.2d 1202, 1204 (7th Cir. 1992).

For guidance on factors that should guide the Bankruptcy Court's equitable discretion, the marchFIRST and the Boone County Utilities Court both cited a case by the United States Court of Appeals for the Sixth Circuit. See Barlow v. M.J. Waterman & Assocs. (In re M.J. Waterman & Assocs.), 227 F.3d 604, 609 (6th Circuit 2000) (the informal proof of claim equitably prevents "the potentially devastating effect of the failure of a creditor to formally comply with the requirements of the Code…when, in fact, pleadings filed by the [creditor] during the claims filing period…puts all parties on sufficient notice" of the claim). The Waterman Court adopted a four-element test to be applied to an asserted informal proof of claim: (1) the filing must be in writing; (2) the writing must contain a demand on the debtor's estate; (3) the writing must express an intent to hold the debtor liable for the debt; and the writing must be filed with the bankruptcy case. Id.

SSFHS argues that the Relief from Stay Motion satisfied all four Waterman elements. First, the Relief from Stay Motion was in writing. Second, the Relief from Stay Motion contained a demand on the debtor's estate by clearly setting forth the amount of SSFHS's claim against TSB and Woodhollow for the pre-petition Percentage Rent due, accrued interest on the overdue Percentage Rent, professional audit fees and reasonable attorneys' fees related to TSB's

execution of the Lease and Woodhollow occupancy of the Leased Premises. Third, the

Relief from Stay Motion manifested SSFHS' intent to hold Woodhollow liable for such amounts.

Fourth, the Relief from Stay Motion was properly filed in the Main Case with the Bankruptcy

Court.[137] Thus, SSFHS concludes that it satisfied the <u>Waterman</u> elements for filing an informal

proof of claim well before the June 14, 2007 claim bar date.

SSFHS further argues that because the Informal Claim was filed timely, the amendment

of the Informal Claim by the SSFHS Claim – following the July 17, 2007 rejection of the Agreed

Order – also was proper. <u>See, e.g.</u>, <u>In the Matter of Oliver Plunkett and Monica Plunkett</u>, 82 F.3d

738, 740 (7th Cir. 1996) ("that an informal proof of claim might supply the foundation for an

amendment…is sound enough in principle."); <u>see also</u>, <u>In re Unroe</u>, 937 F.2d 346 (7th Cir. 1991)

(holding that the court's general equitable powers under 11 U.S.C. §105(a) permit it to allow

post-bar-date amendments of claims). SSFHS argues that its Claim clearly asserts a claim that

arose out of the conduct, transaction, or occurrence set out in the original Informal Claim and,

therefore, relates back to the date of the Informal Claim. <u>See, e.g.</u>, <u>Plunkett</u>, <u>supra</u>, 82 F.3d at

740. SSFHS concludes that the current state of the law in the Seventh Circuit allows for

recognition of its Informal Claim and timely amendment of SSFHS's Claim, and equity demands

such a result.

Here, the amount set forth in the Informal Claim represents the bulk ($769,889.30) of the

total amount of claims ultimately manifested ($965,727.05) in the Main Case after July 17, 2007.

Given that the Main Case essentially is a two-party dispute between SSFHS and Woodhollow,

SSFHS argues that there is no question that Woodhollow clearly has been aware of SSFHS's

---

[137]  R. Ex. I, ¶¶ 12 – 21.

claims against Woodhollow and the bankruptcy estate.

The Bankruptcy Court held that the Relief from Stay Motion cannot qualify as an informal proof of claim because it merely sought relief from the automatic stay and abandonment of the Leased Premises. SSFHS acknowledges that the Relief from Stay Motion did assert SSFHS's intent to eject Woodhollow from its tenancy of the Leased Premises; however it also provided the amount of SSFHS's claim against TSB and Woodhollow related to Woodhollow's occupancy of the Leased Premises and asserted its intention to hold Woodhollow liable for such amounts. SSFHS argues that regardless of the status of the initial lease with TSB, Woodhollow had a possessory interest in the Leased Premises and was obligated to pay SSFHS for Woodhollow's occupancy of the Leased Premises. See, e.g., 11 U.S.C. §365(d)(3) (estate is obligated for use and occupancy of real property during course of bankruptcy case – "[t]he trustee shall timely perform all the obligations of the debtor, except those specified in section 365 (b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503 (b)(1) of this title"); Matter of Handy Andy Home Improvement Centers, Inc., 144 F.3d 1125, 1126-1127 (7th Cir. 1998). Thus SSFHS concludes that, in addition to seeking the requested relief on the basis that the Leased Premises was not a part of the bankruptcy estate, the Relief from Stay Motion properly and timely manifested SSFHS's claim for use and occupancy payments.

Woodhollow, however, strongly contends that the Bankruptcy Court properly determined that SSFHS has no allowable claim. Woodhollow points out that The Bankruptcy Court set June 14, 2007 as the deadline for proofs of claim in the Chapter 11 proceeding and SSFHS did not file its Proof of Claim No. 5 until January 10, 2008, seven days after the established deadline.

The Seventh Circuit discussed the implications of a creditor's failure to timely file a proof of claim in In re: Greenig, 152 F.3d 631 (7th Cir. 1998). In Greenig, two farmers filed for Chapter 12 protection in January 1993. The bankruptcy court clerk served notices on each creditor identified by the debtors, including United Feeds, Inc. The notice issued by the clerk informed each creditor of the May 18, 1995 deadline to file proofs of claim. The debtors filed their reorganization plan well before the claim bar date. United Feed was listed in the plan as a creditor having an allowed claim. Relying on its inclusion in the plan, United Feed failed to file a proof of claim before the bar date. The bankruptcy court confirmed the plan on July 14, 1995. The first payment under the plan was to issue by December 1, 1995. When United Feed did not receive any payment under the plan, it sought leave to file a late proof of claim on April 23, 1996. The court granted leave despite the debtors' objection noting that it was equitable to allow United Feed to rely upon the debtors' treatment of its claim in their proposed plan. The bankruptcy court noted that the order approving the plan is a final adjudication of the allowability of United Feed's claim. The debtors appealed the bankruptcy court's order. Id. at 632-33.

On appeal, the district court reversed the bankruptcy court's grant of leave to file late claim. The district court ruled that late claims that do not fall under an exception, are statutorily barred. Disallowance of the United Feed claim also comported with 11U.S.C. § 502 and Bankruptcy Rules 3002(c) and 9006(b). In granting leave to United Feed, the bankruptcy court rewarded the creditor despite the fact that it failed to timely file its proof of claim. The district court held that such treatment undermined the public policy goals of the Bankruptcy Code. Id. at 633.

United Feed appealed the district court's decision to the Seventh Circuit which affirmed the reversal of the bankruptcy court's order. The appellate court noted that 11 U.S.C. §§ 501-502 provide for the filing of proofs of claim in Chapter 12 proceedings. Id. at 633-34. The court also noted that Chapter 12 creditors could not seek refuge in the provisions of 11 U.S.C. §1111(a) as the statute only exempts Chapter 11 creditors from having to file a proof of claim if the debtor has not listed their respective claims as disputed, contingent or unliquidated. If a creditor fails to file a claim in a timely fashion, that claim is barred pursuant to 11 U.S.C. §502(b).

> Except as provided in subsections (e)(2), (f), (g), (h) and (I) of this section, if such objection to a claim is made, the court, after notice and hearing, shall determine the amount of such claim as of the date of filing of the petition, and shall allow such claim in lawful currency of the United States in such amount, except to the extent that –, . . . . (9) proof of such claim is not timely filed, except as permitted under paragraph (1), (2) or (3) of section 726 of this title or under the Federal Rules of Bankruptcy Procedure.

Id. at 633-34.

Fed. R. Bankr. P. 3002(c) permits the filing of late proofs of claim under certain circumstances in proceedings under Chapters 7, 12 and 13.

> In a chapter 7 liquidation, chapter 12 family farmer's debt adjustment, or chapter 13 individual's debt adjustment case, a proof of claim is timely filed if it is filed not later than 90 days after the first date set for the meeting of creditors called under §341(a) of the Code, except as follows:
>
> (1)    A proof of claim is filed by a governmental unit is timely filed if it is filed not later than 180 days after the date of the order for relief. On motion of a governmental unit before the expiration of such period and for cause shown, the court may extend the time for filing of a claim by the governmental unit.
>
> (2)    In the interest of justice and if it will not unduly delay the administration of the case, the court may extend the time for filing a proof of claim by an infant or incompetent person or

the representative of either.

    (3)      An unsecured claim which arises in favor of an entity or becomes allowable as a result of a judgment may be filed within 30 days after the judgment becomes final if the judgment is for the recovery of money or property from that entity or denies or avoids the entity's interest in property. If the judgment imposes a liability, which is not satisfied, or a duty, which is not performed within such period or such further time as the court may permit, the claim shall not be allowed.

    (4)      A claim arising from the rejection of an executory contract or unexpired lease of the debtor may be filed within such time as the court may direct.

    (5)      If notice of insufficient assets to pay a dividend was given to creditors pursuant to Rule 2002(e), and subsequently the trustee notifies the court that payment of a dividend appears possible, the clerk shall notify the creditors of that fact and that they may file proofs of claim within 90 days after the mailing of the notice.

Id. at 634.

United Feed could not demonstrate that any of the exceptions under R. 3002 (c) applied, therefore is claim was barred pursuant to 11 U.S.C. §502(b)(9). The appellate court also noted while bankruptcy courts are vested with equitable powers, such powers cannot be used to disregard statutory and constitutional requirements. Id. at 635. In addition to the limitations imposed by R. 3002(c)as discussed above, the bankruptcy court's exercise of its equitable powers was also limited by Fed.R.Bankr.P. 9002(b)(3) which governs the enlargement of time in bankruptcy proceedings:

The court may enlarge the time for taking action under Rules 1006(b)(2), 1017(e), 3002(c), 4003(b), 4004(a), 4007(c), 4008(a), 8002, and 9033, only to the extent and under the conditions stated in those rules. In addition, the court may enlarge the time to file the statement required under Rule 1007(b)(7), and to file schedules and statements in a small business case under § 1116(3) of the Code, only

44

to the extent and under the conditions stated in Rule 1007(c).

<u>Id</u>. at 634-35.

As Woodhollow argues, the decision in <u>Greenig</u> is equally applicable to the instant action

due to the operation of Fed. R. Bankr. P. 3003(c)(3) which provides:

> The court shall fix and cause shown may extend the time within
> which proof of claim or itself may be filed. Notwithstanding, the
> expiration of such time, a proof of claim may be filed to the extent
> and under the conditions stated in Rule 3002(c)(2), (c)(3), (c)(4) and
> (c)(6).

None of the exceptions apply. A claim arising from the rejection of an unexpired lease

does not help SSFHS because Woodhollow is not a party to the Lease. The Agreed Order issued

in Cause No. 45D05-0108-CP-384 is the only other agreement between Woodhollow and SSFHS

that was in existence at time the claim bar date passed. There is no dispute that Woodhollow

performed the terms established by the state court order. The Bankruptcy Court correctly

concluded that there was no other lease or contract between the parties. Therefore, no exception

is available to SSFHS under Bankruptcy Rules 3002 and 3003.

SSFHS does not and cannot claim relief due to the fact that Woodhollow listed SMMMC

in Schedule F of its petition as "disputed" claim.

> A proof of claim or interest is deemed filed under section 501 of this
> title for any claim or interest that appears in the schedules filed under
> section 521(1) or 1106(a)(2) of the title, except a claim or interest
> that is scheduled as disputed, contingent, or unliquidated.

11 U.S.C. §1111(a); <u>Greening</u>, 152 F.3d at 633, n.2.

SSFHS argues that its claim arises, in part, due to Woodhollow's rejection of the 2001

Agreed Order. SSFHS notes that the Bankruptcy Court never set a deadline to reject executory

contracts or unexpired leases before Woodhollow agreed to vacate the Leased Premises in July

2007. However, SSFHS conveniently forgets that it negotiated the Debtor's departure with the assistance of the Bankruptcy Court during the June 27, 2007 hearing. Woodhollow did not reject the Agreed Order, the parties mutually agreed to terminate Woodhollow's occupancy.[138]

SSFHS also fails to address the fact that Woodhollow occupied the Leased Premises between 1999 and 2007. The physical improvements to the structure were completed before Woodhollow Loft Bar and Grill initially opened for business. SSFHS was fully aware of the value of its investment and the rents received in the eight years preceding the claims bar date. SSFHS possessed enough information to file its claim on or before the bar date. SSFHS has not identified any impediment that precluded it from meeting the June 14, 2007 deadline.

SSFHS has argued that its March 21, 2007 Verified Motion for Relief from Stay constitutes an informal proof of claim which could legitimize its untimely Claim No. 5-1.  As noted, the informal proof of claim doctrine allows the Bankruptcy Court, in its discretion, to treat untimely formal proofs of claim as amendments to a timely informal claim. Wilkens v. Simon Brothers, Inc., 731 F.2d 462, 464-65 (7th Cir. 1984); Matter of DeVires Grain & Fertilizer, Inc., 12 F.3d 101, 103 (7th Cir. 1993); In re: Outboard Marine Corp., 386 F.3d 824, 828-29 (7th Cir. 2004). The five elements needed to establish an informal proof of claim are:

1.  the informal proof of claim must be in writing;
2.  the writing must contain a demand by the creditor on the debtor's estate;
3.   the writing must express an intent to hold the estate liable for the debt;
4.   the writing must be filed with the Bankruptcy Court; and
5.  based upon the facts of the case, it must be equitable to allow the claim.

---

[138]  AD 50, 58, 59 and 66; RD Ex. C.

In re Brooks, 370 B.R. 194, 200 (Bankr. C.D. Ill 2007). To be equitable, the informal proof of

claim doctrine cannot be used "to prejudice other creditors." Id. at 200.

In its March 21, 2007 Verified Motion for Relief from Stay and Abandonment of Real

Property, SMMHC made the following statements:

> 9.      On or about April 6, 1999, TSB executed a Lease
> Agreement in which SMMHC leased approximately 6,300 square feet
> of the Omni 41 Health and Fitness Connection ("Omni") to TSB for
> five (5) years from the date of commencement (the "Lease"). The
> Commencement Date (defined in the Lease) was July 1, 1999, thus
> the Lease expired on or about June 30, 2004 (the "Expiration Date")
> . . .

> 10.      TSB failed to pay and Fixed Rent or Percentage Rent
> (both terms defined in the Lease) in 1999. TSB made a few Fixed
> Rent payments in early 2000 to satisfy its overdue payments from
> 1999. TSB stopped making regular Fixed Rent payments required by
> the Lease in August of 2000 which continued to August of 2001.

> 11.      By February 2001, Weichman and Associates was
> TSB's accounting firm and Jack Weichman and the shareholders of
>
> TSB had already formed Woodhollow [Woodhollow Loft, Inc.] to
> operate the restaurant located at the Real Estate [Omni leasehold].

> 12.      On August 3, 2001, counsel for SMMHC sent a
> default notice to TSB and Woodhollow for all Fixed Rent payments
> due since May 6, 2000.

> 13.      TSB was also in default under the terms of the Lease
> for failure to provide financial information and make payment of
> Percentage Rent, which had not been paid by TSB at all.

> 14.      On or about August 9, 2001, six days after SMMHC's
> notice of default for payment of rent, SMMHC filed suit against TSB
> and Woodhollow in the Lake Superior Court as Cause No. 45D05-
> 0108-CP-384 seeking termination of the lease, possession,
> accounting, damages and specific performance.

* * *

22.     SMMHC has never entered into any written agreement to allow Woodhollow to assume the rights of TSB under the Lease.

B. SMMHC SHOULD BE GRANTED RELIEF FROM THE AUTOMATIC STAY BECAUSE WOODHOLLOW HAS NO RIGHTS UNDER THE LEASE

23.     Section 362(d)(2)(A) of the Bankruptcy Code provides that:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay –
>
> > (2) with respect to a stay of an act against property under subsection (a) of this section, if –
> >
> > > (A) the debtor does not have an equity in such property.

24.     Cause exists for granting SMMHC relief from the automatic stay because Woodhollow does not have any legal right to possession of the premises under the Lease.

25.     On January 12, 2004, Woodhollow attempted to exercise TSB's option to extend the Lease for an additional five years under the Lease. That attempt failed for three reasons. First, Section 2.2 of the Lease requires TSB to give SMMHC written notice 180 days prior to the expiration of the initial lease term. The initial lease term expired on June 20, 2004. Notice of intent to exercise the option had to be given no later than January 2, 2004. Notice of intent to exercise the option had to be given no later than January 2, 2004. Second, TSB was in material breach of the Lease at the time and SMMHC had already moved to terminate the Lease. Finally, TSB is the tenant under the Lease and the only party with a possible right to exercise the option. Woodhollow has no legal rights under the Lease.

26.     Woodhollow's attempts to exercise an option to extend the Lease to which it is not a party are without effect.

27.     "The Code provides that the commencement of a bankruptcy case creates an estate comprised of all legal or equitable interests of the debtor. However, the estate succeeds to no more interest than the debtor had, and the estate takes its interest subject to the conditions under which the debtor held the interest." Kipp v. Depoy, 29 B.R. 466, 469 (N.D.Ind. 1983)

28.     Wood hollow filed for bankruptcy on February 2, 2007. At the time of the Petition Date, TSB was in default for failing to pay the Percentage Rent, TSB failed to exercise its option to extend the Lease, and SMMHC had already moved to terminate the Lease. These key events effectively terminated TSB's rights under the Lease. Woodhollow is not a party to the Lease and thus has no interest under the Lease to terminate, thus, the estate of Woodhollow succeeds to no interest under the Lease.

C. FURTHERMORE, SMMHC SHOULD BE GRANTED RELIEF FROM THE AUTOMATIC STAY BECAUSE THE LEASE WAS TERMINATED PRE-PETITION.

29.     Section 365(c)(3) of the Bankruptcy Code further provides that:

> (c) The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if –
>
> > (3) such lease is of nonresidential real property and has been terminated under applicable nonbankruptcy law prior to the order for relief.

30.     Failure to make rental payments when due under the Lease, failure to timely exercise the option to extend the Lease, SMMHC's notice of default to the tenant, as well as filing suit seeking termination of the Lease, all of which occurred prior to the Petition Date, satisfied an effective pre-petition termination of the Lease.

31.     Because the Lease was terminated pre-petition, TSB lost all interest in the Lease prior to the Petition Date.

BD #31, pgs. 2-6.

SSFHS's Motion for Relief from Stay does not constitute an informal proof of claim.

First, the motion does not contain a demand against the bankruptcy estate or intent to hold the

estate liable. Rather, the March 21, 2007 filing merely sought relief from the automatic stay and

the abandonment of certain SSFHS property from the Debtor's bankruptcy estate. In order to

obtain relief from the stay, SSFHS admitted that (1) sums were due and owing under the Lease, (2) the Debtor was not a party to the Lease, (3) the Debtor had no rights under the Lease and (4) the Debtor could not exercise an option to extend the Lease for an additional five years. Clearly, such statements are not indicative of either a demand against the Debtor's bankruptcy estate or intent to seek recovery therefrom.

Despite the Seventh Circuit's prior recognition of the informal proof of claim doctrine, this court is unaware of any case which has addressed the conflict between the doctrine and the rules outlined in In re: Greenig. A similar scenario confronted Judge Robert Grant in In re: Fink, 366 B.R. 870, 876-77 (N.D.Ind. 2007), a Chapter 7 case from the Fort Wayne Division. In Fink, the debtor's former spouse and her counsel received timely notice of the proof of claim deadline. Despite having received notice, the former spouse did not file her $3,200,000 proof of claim until the day after the bar date. The trustee objected to the untimely claim. The claimant argued that her Motion for Relief from Automatic Stay and Abandonment and / or a Complaint to Determine Dischargeability of Debt should be viewed as a defacto claim. Id. at 872-73. The Bankruptcy Court found that neither motion met the requirement.

In granting the trustee's objection, the Bankruptcy Court discussed why the informal proof of claim doctrine should be severely limited:

> Trimmed back to something more closely approximating the doctrine's original shape, an informal proof of claim is a defective claim. In other words, it is an effort to assert a claim against the bankruptcy estate which, usually for technical reasons, fails to fulfill the required formalities. American Classic Voyages, 405 F.3d at 132; Waterman & Assoc., 227 F.3d at 608-09; Stoecker, 5 F.3d at 1028. It should not be found in a masquerade in which some other type of relief is sought and then subsequently unmasked to reveal what is argued to have been a proof of claim all along. This is especially so when the filings have been made by sophisticated law firms and

experienced bankruptcy practitioners. It is one thing to treat filings made by pro se creditors who may not understand the bankruptcy process with a degree of latitude -- in precisely the same way that the pleadings filed by pro se litigants are broadly construed so as to preserve the controversy for a disposition on the merits. It is quite another thing, however, when those filings come from attorneys. <u>Outboard Marine</u>, 386 F.3d at 828. They are held to a higher standard. <u>See</u>, <u>Matter of Maurice</u>, 69 F.3d 830, 834-35 (7th Cir.1995). Attorneys, particularly experienced bankruptcy practitioners, are expected to know the difference between motions and objections and adversary proceedings and claims, and they are expected to file the appropriate thing at the appropriate time..... A permissible amendment must begin with the proposition that the avowed purpose of the original submission was an attempt to file a proof of claim; if so, then deficiencies or shortcomings in the original filing may be corrected. The court should not begin with a filing that was consciously designed to serve one purpose and then find within that document a different purpose altogether, thereby legitimizing an otherwise untimely claim.... Properly confined, the informal claim doctrine can be applied liberally in order to honor the substance of the creditor's actions -- the genuine attempt at filing a proof of claim -- rather than allowing technical details of form to thwart the effort.

<u>In re Fink</u>, 366 B.R. at 876-77. The Bankruptcy Court held that the concept of an informal claim is wholly equitable in nature and must be limited for any other approach would risk allowing the equitable exceptions to swallow the general rule, rendering the claims bar date potentially meaningless. <u>Id.</u> at 879.

In the present case, the Bankruptcy Court's adoption of standard identified in <u>In re: Fink</u> was clearly appropriate. Accordingly, this court finds that the Bankruptcy Court's determination as to SSFHS's claim against Woodhollow was proper under the circumstances given the facts and the law, and the decision will be affirmed.

<u>Conclusion</u>

On the basis of the foregoing, the decision of the Bankruptcy Court is hereby

AFFIRMED.


Entered: May 25, 2010.

<u>s/ William C.  Lee</u>
William C. Lee, Judge
United States District Court
